UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** Plaintiff | **2:21-CR-20559-TGB-EAS** |
| vs. | HON. TERRENCE G. BERG |
| **BRANDON TYLER ALLISON,** Defendant. | **OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS (ECF NO. 69)** |

In this criminal case, Defendant Brandon Tyler Allison moves to suppress the contents of his cell phone, which was seized by the Michigan State Police, as well as statements he gave during an interview. ECF No. 69. Allison has been indicted on following charges: (1) Attempted Sexual Exploitation of Children, 18 U.S.C. § 2251(a), (e); (2) Attempted Coercion and Enticement of a Minor, 18 U.S.C. § 2422(b); (3) Transfer of Obscene Materials to Minors, 18 U.S.C. § 1470; (4) Distribution of Child Pornography, 18 U.S.C. § 2251A(a)(2); (5) Sexual Exploitation of a Child, 18 U.S.C. § 2251(a); (6) Coercion and Enticement of a Minor, 18 U.S.C. § 2422(b); and (7) Possession of Child Pornography, 18 U.S.C. § 2252A(a)(5)(B). ECF No. 51. The Court held a hearing on Defendant Allison's motion to suppress on November 17, 2025. For the following reasons, Allison's motion is **DENIED**.

1

# I. BACKGROUND

## A.    Background to the April 15, 2021 Interview

In November 2019, the Michigan State Police ("MSP") investigated a series of incidents involving child sex abuse materials ("CSAM") that were sent to or requested of individuals who were minors. ECF No. 69-29, PageID.449. The incidents were connected to Snapchat accounts which the MSP traced to Defendant Allison. *Id.*

In April 2021, MSP identified a possible address, 5175 Cummings Rd., Jackson, Michigan. This was a location where Allison had previously resided. ECF No. 75-2, Michigan State Police Report, PageID.621.[1]

On April 14, 2021, MSP Trooper Ryan Davis visited the residence in an "attempt[] to make contact with Allison." *Id.* The "homeowner … advised [that] Allison lived there but moved out in August." *Id.*

On April 15, 2021, Davis returned to the residence. *Id.* The homeowner "stated he picked Brandon [Allison] up that morning and Brandon was in the residence at that time." *Id.* Davis asked whether he "could speak to [Allison] and [the homeowner] agreed and retrieved [Allison]." *Id.*

---

[1] The Court relies on a Michigan State Police report prepared by MSP Trooper Ryan Davis, originally dated October 28, 2019 and amended on April 15, 2021, for the background leading up to the April 15, 2021. With one exception, which the Court notes below, the relevant facts align with Officer Davis's sworn testimony provided during a November 17, 2025 evidentiary hearing.

Davis asked Allison whether "he would be willing to speak to me at the MSP Jackson Post about an ongoing investigation." *Id.* at PageID.622. Allison agreed that he would be willing to "ride to the post for an interview." *Id.* In his report, Davis writes that "[a]fter contact with Allison was made, [he] seized [Allison's] cell phone that was on his person." *Id.* Later, during the evidentiary hearing, Davis clarifies that while the cell phone was in Allison's pocket when he was initially talking to him, at the time of the seizure the cell phone was on a table along with a second cell phone that was also seized. *Id.* ECF No. 88, PageID.801–02.

Once Allison was in Davis's patrol vehicle, Davis "advised [Allison that] he was not being detained and was free to not answer my questions and I would take him home at once." ECF No. 75-2, PageID.622. Allison indicated "that he understood." *Id.* Allison was transported "in the front seat of [the] patrol vehicle." *Id.*

### B.   April 15, 2021 Interview

At the MSP Jackson Post, Allison was placed in an interview room with no windows. Video, dated April 15, 2021 (on file with the Court). The room was equipped with a video recording system that recorded the entire interview. *Id.* The Court reviewed the entire video of the interview as well as the transcript of the interview, *see* ECF No. 77. To provide a full context, the Court summarizes in some detail the interview of Allison as recorded in the video and transcript.

3

In the video, Allison is not handcuffed. *Id.* The door to the room does not appear to have been locked. *Id.* Allison has a bottle of soda with him. *Id.* The interview lasts from 5:28 p.m. to 6:20 p.m. *Id.*

After a few moments of casual conversation about the ongoing pandemic, Davis informs Allison that "I've been looking for you for quite a while … because I need to talk to you about some stuff.'" ECF No. 77, PageID.634. After Davis and Allison discuss Allison's living situation, Davis asks Allison "do you have any idea why we're here right now?" *Id.* at PageID.636. Allison responds, "You said you've been looking for me for some time now." *Id.* at PageID.637. Davis responds, "Yep, I have." *Id.* Allison says, "I'm hoping I was entitled to somebody." *Id.* At this point, Davis's phone rings. *Id.* After another interruption, Davis steps out of the room. *Id.*

When he returns, Davis and Allison discuss Allison's marijuana consumption. *Id.* at PageID.638–39. Davis informs Allison that "even if it wasn't legal right now, I don't give a shit about that stuff … that means nothing to me." *Id.* at PageID.638.

Davis then tells Allison,

So anyway, so I brought you here today. Like I said, I've been looking for you for a while. I need to talk to you about some stuff. I need to ask you some questions. So, before I start talking about the stuff, I am going to tell you again, you don't have to answer my questions—

*Id.* at PageID.639. Allison interjects, "Right." *Id.* Davis continues, "—and you're free to get up and say pound sand. I don't want to talk to you, and I'll take you back home, okay? *Id.* Allison responds, "Okay." *Id.* Davis continues, "You're not being kept here. You're not detained. Nothing like that. … So, I just wanted to let you know. If you have any questions on that, whatsoever, you just make sure you let me know." *Id.* at PageID.639–40.

> Davis then addresses the importance of responding truthfully,

> As I told you, I'm a straight shooter. I'm just going to come out with it, and I would hope that you will be man enough to tell me the truth. … Because I'm one of those guys—I'm kind of old-school. You tell me the truth, and then we can work with things. … You start lying to me then, you know, I'm going to take that thing as far as I can take it because I have the authority and the power to … let's, let's—you know, let's work with stuff. He's being honest. He's manning up. He's being a man to me. Or if he's going to make me run in circles and go the long route … then we're going to push this thing, okay?

*Id.* at PageID.640. Allison responds affirmatively. *Id.*

Davis then asks "So, do you think it's weird that I grabbed your phones?" *Id.* at PageID.640–41. Allison responds, "No." *Id.* at PageID.641.

> Davis states:

> I'm taking your phones for an investigation. … I'm a trained observer. When I walked up, you had that phone in your pocket, that blue one, and you had the weed next to it, and I watched you set it down on the table. When I went inside the house, I said is this Mr. Allison's phone, and both people

> inside said yeah, that's his phone. You just set it down. Okay,
> I know it's your phone.

*Id.* at PageID.641.

Davis then informs Allison that in December 2019, he "got a call from somebody up in Rives Township to do an investigation. So, I go up and do an investigation, and they show me on the phone, through Snapchat, that somebody was contacting them through Snapchat. Have you ever had a Snapchat account?" *Id.* at PageID.642. Allison responds that he has, and that the name of the account was "Smoke2134." *Id.* Davis asks, "Did you ever went by BrandonSmokestacks?" *Id.* Allison responds, "No. … I told you I'd been hacked. I had four emails hacked over the summer." *Id.*

Davis then asks Allison questions about Snapchat and whether Allison ever sent nude pictures of himself over Snapchat. *Id.* at PageID.642–46. Allison maintains that he did so in 2019, but not since. *Id.* at PageID.645. Davis transitions to asking Allison about sending pictures to underage girls. *Id.* at PageID.646–49.

Eventually, Allison admits that he sent pictures to underage girls a "long time ago." *Id.* at PageID.648.

After Davis and Allison discuss whether and how Allison knew the age of the people he had been corresponding with, *Id.* at PageID.648–49, Davis tells Allison

> I'm just going to come out with it. After that—after I took that
> investigation and I saw the communications between the

person and the Snap user on her phone and her … who was clearly not even 16, so not at the age of consent for either one, right? … So I took that phone, brought it back, did what's called a preservation record of Snapchat, and I asked for three—from that date—anything on that BrandonSmokestacks account—I'd have to look at exactly what the account is—from that date, back three months. And they retained that for me. I take that information. I get a search warrant. A judge reads the probable cause to get a search warrant to Snap. Got the results back on a thumb drive. Guess what I found on there? … I found not only pictures of somebody who looked exactly like you … going by your name in Jackson, Michigan. I also found child pornography on there, okay?

*Id.* at PageID.649–50. Allison responds, "Yeah, so I did all this stuff, and I don't know who I text. I don't think I did. I think someone took some of my stuff when I was hacked. This was back in 2019." *Id.* at PageID.650. Allison then states, "I have child porn on my phone … I want to report it. … There's a Dropbox that I want to report it, but I don't know exactly what to do with it." *Id.* at PageID.650–51.

Davis asks, "Is that on your blue phone?" *Id.* at PageID.651. Allison admits, "Yeah." *Id.* Davis asks, "would you be willing to write out a consent that you have that on your phone?" *Id.*

Immediately after, Allison again explains, "In 2019, my accounts were gone." *Id.* Davis asks, "And is that stuff still on your phone then?" *Id.* Allison responds, "Yes, I just recently got it, and I'm trying to get it off." *Id.*

Davis then asks Allison whether he would "be willing to show me the passcode and just show me it—where that stuff is at?" *Id.* at PageID.652. Allison responds, "I could sign into it right now." *Id.*

At this point, Davis leaves the room to get the necessary consent forms. *Id.* As he was leaving, Davis asks Allison "You got your Mountain Dew? … Are you good with that? Do you need any water or anything?" *Id.*

When Davis returns with the consent forms, Allison tells him that he "want[s] to be an ongoing investigator for this." *Id.* Davis responds,

> So, what I need to do before we do this, I need to get what's called a consent form … and I want you to sign that, if you're willing to do so, telling me the passcode and opening the phone to show me, okay. But if you don't mind—you don't have to if you don't want to …

*Id.* at PageID.652–53. Allison interjects, "Can I see the warrant, though, first." *Id.* at PageID.653. Davis responds, "Well, it's—there was the search warrant that went to the Snap account. I've actually served …" *Id.* In response, Allison explains that he no longer had access to his Snapchat account. *See id.*

> After Allison finishes his explanation, Davis states,
>
> Okay, so if you don't mind, if you want to—if you don't want to, it's no big deal—if you would write a statement on here … I'll get you a pen—saying exactly what you know about the child porn being on your phone, about sending stuff on Snap, all that kind of stuff, okay? The more you write, the better it's going to help you out …

*Id.* at PageID.653–54. Allison responds, "Where's the … way I can actually send that info to get that stuff deleted off the web? Like that what I want." *Id.* at PageID.654. Davis explains, "There's a retention period where they hold it and then it just gets deleted anyway, okay?" before leaving the room to get a pen. *Id.*

When he reenters the room, Davis asks Allison to write down "how much child porn you might have on your phone." *Id.* at PageID.655. Allison admits that there were "57 videos." *Id.*

After Davis instructs Allison to put the necessary information on the form, Allison again tells Davis that he had been "reporting all the profiles recently for it." *Id.* at PageID.655–56. Allison then begins filling out the form and Davis leaves the room. *Id.*

When Davis returns, Allison asks, "Can I get into that phone for you? … Because I have child porn on it, if you use my password." *Id.* at PageID.660. After Davis asks whether Allison would be willing to put his social media information "to see if maybe you were hacked, like maybe your Gmail accounts," Allison responds, "I can't even tell you how long ago those Gmails were hacked." *Id.*

Allison then asks Davis what else he should put onto the form (Allison: "What else do you want me to do?"), Davis answers (Davis: "Just any, like any phone numbers, Gmail accounts, Snap accounts, Facebook accounts, Comcast account. Comcast, if you have Comcast … So just any information you can think of off those phones, like if you remember your

Gmail address. … You don't need the passwords … just the accounts.")
and leaves the room. *Id.* at PageID.661–62.

When Davis returns, he continues the interview of Allison. *Id.* at
PageID.662–65. Eventually, Davis explains, "by you signing this saying
that you're giving me consent to open this phone up, give me the
passcodes and look in this phone." *Id.* at PageID.665. Allison nods. *Id.*
Davis continues, "If you're okay to sign that, if you could sign that right
there." *Id.* Allison responds, "You already know what I got in it. There's
other nudes of other girls, but they're all of age." *Id.*

Allison then signs the consent form, titled "Authorization For
Release of Information." ECF No. 75-3, PageID.627. That form states, in
relevant part,

> This release is executed with the full knowledge and
> understanding that the information is for official use by the
> Michigan State Police. Consent is granted for the Michigan
> State Police to furnish such information as indicated above, to
> law enforcement entities in the course of the State Police
> fulfilling its official responsibilities.

*Id.*

Davis asks Allison about the spelling of his passwords and the
meaning of his usernames. ECF No. 77, PageID.665–66. When Davis
asks for "the passcode of this phone," Allison volunteers, "Here, can I just
put my finger. It would be easier." *Id.* at PageID.666. After Allison tells
Davis the password, Davis asks him "show me on [the phone] where I'm

10

going to find that?" *Id.* Allison then explains to Davis where on the phone Davis can find the images. *Id.* at PageID.667–68.

After Davis finds the images, Allison and Davis discuss whether and how Allison knows that the individuals in the images are underage. *Id.* at PageID.668–69. Asked about the age of the individual in one picture, Allison volunteers that he thinks she is "six." *Id.* at PageID.669.

Then, Davis asks Allison how the images got into his possession. *Id.* Allison explains that they are in his possession so he can "report the account." *Id.* Davis, putting the phone aside, tells Allison, that "we're going to hang onto that one." *Id.*

Davis continues his interview of Allison. *Id.* at PageID.670–81. Among other things, Davis and Allison discuss the content of the materials on the phone, the age of the individuals depicted in the content, and the communication Allison had with the underage individuals. *Id.* Throughout, Allison maintains that he has been "hacked." *See*, *e.g.*, *id.* at PageID.680. Davis and Allison discuss the exact circumstances of Allison's claim that his accounts have been hacked. *Id.* at PageID.681–82.

Davis then asks Allison, "Did you—if you don't want to, you don't have to, but if you could, could you write on there that you knew that the child porn that the girls were underage and approximately 6 to 14 years old." *Id.* at PageID.682. Allison does so. *Id.* Allison then asks, "will you

11

just let me go home after this?" *Id.* Davis responds, "Yep, yep. I never told you I was going to arrest you, right?" *Id.* Allison responds, "Right." *Id.*

Davis then informs Allison of the upcoming steps in the investigation. *Id.* at PageID.682–83. After he does so, Davis references an online exchange Davis and Allison had on Snapchat in October or November of 2019. *Id.* at PageID.684. In that exchange, Allison purportedly wrote to Davis that he "would never catch" him. *Id.* Davis asks Allison whether he remembers. *Id.* Allison insists that he was not on Snapchat. *Id.* Davis and Allison begin arguing over the timing of when Allison was on Snapchat and what information investigators will uncover. *Id.* at PageID.684–89. Davis then tells Allison, "I'm not trying to lecture you; I'm just telling you what's going on, okay? But I'm telling you when you were taunting me out there that day, that just gave me a lot of fuel for this fire, okay? … So here I am. I gotcha." *Id.* at PageID.689. Allison reminds Davis that "If anything comes up that I was hacked." *Id.*

Davis and Allison then discuss whether Allison was okay to be taken back home. *Id.* at PageID.689–90. Allison insists that he will be fine and explains, "I just don't want to go to the jail or anything." *Id.* at PageID.690. Davis responds, "I told you I'm not taking you to jail right now, right?" *Id.*

Davis and Allison discuss the likelihood of whether Allison will be "forgiven." *Id.* at PageID.690–91. Allison repeats that he was "hacked."

*Id.* at PageID.691. Davis tells Allison that he hopes "this feels good to get this shit off your chest." *Id.* at PageID. 692. The two leave the room. *Id.*

Davis then drove Allison back to the Cummings Road residence. ECF No. 75-2, PageID.624.

## C.   November 17, 2025 Hearing

The Court conducted an evidentiary hearing on the motion on November 17, 2025. At the hearing, the Government presented Trooper Davis as a witness. ECF No. 88, PageID.777. His relevant testimony is summarized below.

In April 2021, by "[u]sing some of the state police search tools such as LEIN and one called MI-Intel, [Davis] was able to track down some of [Allison's] former residences." *Id.* at PageID.780–81. Davis "spoke with a homeowner of one of the residence that [Allison] lived at who advised that he lived there off and on, and he had spoke with him previously to that— I believe the day before." *Id.* at PageID.781.

The next day, Davis, wearing his state police uniform, "went back to the residence the next day, spoke with the homeowner … was outside of his residence, and … asked if Mr. Allison was there and [the homeowner] advised he was in the residence at that time." *Id.* at PageID.781–782. Davis then "asked the homeowner if he could go retrieve Mr. Allison from inside and he brought Mr. Allison out." *Id.* at PageID.781.

13

When Allison came out, Davis "spoke with him and identified myself"—as "Trooper Ryan Davis"—"and advised that I had an investigation, that I would like to speak with him at the police post." *Id.* at PageID.782. In response, Allison "agreed to speak with" Davis. *Id.*

Davis testified that he did not arrest Allison and did not require Allison to come to the station. *Id.* at PageID.783. Instead, Davis told Allison it was "voluntary" to come to the station. *Id.* When asked what the tone of his voice was when he was speaking to Allison, Davis responded, "The same tone I'm using right now." *Id.*

Prior to leaving, Davis "collected a cell phone that [Allison] had in his pocket while [Davis] was speaking with him." *Id.* Davis testified that he "seized it and—and brought it with me in my patrol car." *Id.* Specifically, Davis explained that he "seized the phone because [he] believed it had contraband on it, and since it was in [Allison's] pocket, one would assume that it belonged to him." *Id.*

In response to an inquiry into why Davis thought the cell phone had contraband on it, Davis testified,

> Through some of the search warrants that I had conducted, I did a—I believe it's called a GEO search to try to track down where he was using Internet services from. Through my investigation I determined that he was using public Wifi, which meant he did not have like a laptop or an iPad or something of that nature, which would lead me to believe that he was conducting or having the contraband on his phone through a cell phone, it wasn't at a home.

14

*Id.* at PageID.783–84. Specifically, Davis thought Allison had "[c]hild pornography" on his phone. *Id.* at PageID.784. When asked why he thought so, Davis explained that a warrant for a Snapchat account yielded "evidence of child pornography connected with that account." *Id.* Allison was identified "as the user of that Snapchat that [Davis] had gotten the search warrant for." *Id.* Davis explained that "Through my investigation of the search warrants that I conducted, Snapchat in particular, I was able to get a picture of Mr. Allison. He identified himself several times through the Snapchat search warrant that I got back and it said he lived in Jackson, Michigan." *Id.*

Davis and Allison drove to the station in Davis's patrol car. *Id.* Davis was seated in the driver's seat and Allison was seated in the front passenger seat. *Id.* at PageID.784–85. Allison was not handcuffed. *Id.* at PageID.785.

The ride to the station took approximately ten minutes. *Id.* During that time, the two engaged in "general chatter." *Id.* When asked what the tone of the conversation was, Davis testified that it was "like the tone I'm using right now." *Id.* When asked whether Davis asked Allison "any questions that were intended to elicit incriminating statements at that time," Davis testified that he did not. *Id.* at PageID.785–86.

Davis testified that at no point in the interview did Allison appear to have any issues understanding him. *Id.* at PageID.791. Davis also testified that he was "tracking" his questions. *Id.*

After the interview ended, Davis asked Allison, "where he wanted me to take him." *Id.* at PageID.792. Davis then drove Allison back to the Cummings Road residence. *Id.* at PageID.792–93. On the drive back, Allison was seated in the front passenger seat and was not handcuffed. *Id.* at PageID.793. Davis testified that he did not discuss anything substantive about the case during the drive. *Id.*

On cross-examination, Davis testified that he used LEIN multiple times throughout the investigation and did not come across a mental health order from the Jackson County Probate Court. *Id.* at PageID.795. Davis also testified that he is aware that "under the statute you're required—a mental health order requires law enforcement to take the person into protective custody and take them to a mental health facility." *Id.* When asked whether he had ever seen "the mental health order recorded on the LEIN," Davis responded that he did not "recall." *Id.* at PageID.796.

When asked whether his testimony regarding the fact that Allison was "tracking" what he was saying, Davis clarified that it was his lay opinion and that he is "not a doctor." *Id.* at PageID.797.

On cross-examination, Davis also testified that before he returned to the Cummings Road residence, he had a belief that he might be looking for a cell phone. *Id.* at PageID.800. Davis testified that he didn't obtain a warrant for the cell phone because "wouldn't know what to write a search

16

warrant for if I didn't have the actual phone to write the search warrant for." *Id.* at PageID.801.

Davis testified that while the cell phone was in Allison's pocket during the time the two were speaking, when he seized the cell phone, it was on the table with a second cell phone. *Id.* at PageID.801–02. Davis testified that the phone was not in Allison's hand when he seized it. *Id.* at PageID.802.

Davis also testified that he was not aware that Allison was under the jurisdiction of the Jackson County Probate Court. *Id.*

When asked whether the "purpose in questioning him was to hopefully obtain a confession that you could use to prosecute him, correct?" Davis responded, "From my investigation, that is correct." *Id.* at PageID.807.

After the re-direct, the Court examined Davis. The Court asked, "So the reason that you didn't get a search warrant was because you didn't have the technical information to identify the phone?" to which Davis responded, "That is correct." *Id.* at PageID.810.

The Court also asked Davis whether he saw "anything in the LEIN regarding [Allison's] mental health?" *Id.* at PageID.811. Davis responded, "If—if there was a mental pick-up order, it would have came through as a LEIN that he—I don't want to call him a fugitive but essentially we— we need to pick him up. That would have been the first thing to pop up

and that did not pop up." *Id.* The Court followed up, "Do you recall whether you saw anything in the LEIN regarding his mental health history?" *Id.* Davis responded, "I—I don't recall anything about his mental health history mainly because I was just looking for addresses." *Id.* The Court then asked, "Did you know when you went to speak with him and when you interviewed him that he had any mental health history?" *Id.* Davis responded, "No." *Id.*

### D.   Procedural Background

On April 29, 2021, Davis obtained a search warrant for the cell phone which had been seized from Allison. ECF No. 69-29. The affidavit accompanying the search warrant includes information obtained from the investigation preceding the April 15, 2021 interview, information obtained from Allison during the interview, and information obtained from the search of the cell phone which occurred during the interview. *Id.*

On August 31, 2021, a grand jury returned an indictment against Allison. ECF No 1. He was arraigned on November 10, 2021. Two separate court-ordered competency reports were conducted for Allison. ECF No. 23 (May 18, 2022 Order to Appoint Psychologists to Assist in the Analysis of the Defense in this Case as to Brandon Tyler Allison); ECF No. 30 (January 26, 2023 Order Granting Defendant's Ex Parte Motion, Submitted in Camera, for a Second Competency Evaluation). The Court conducted a competency hearing on September 13, 2023, ECF No.

18

36, and issued an order finding Allison competent to stand trial on September 21, 2023, ECF No. 37. In October of 2024, Allison requested a new attorney and, after a hearing, one was appointed for him. ECF Nos. 44, 45, 47, 48. On December 19, 2024, a grand jury issued a superseding in indictment, which is the operative charging document in this case. ECF No. 51.

On July 2, 2025, Allison filed a motion to suppress. ECF No. 69. The Government responded on August 27, 2025. ECF No. 75. On October 3, 2025, Allison replied. ECF No. 82.

On November 17, 2025, the Court held a hearing on the matter. On November 26, 2025, Allison filed a supplemental brief. ECF No. 92. On December 5, 2025, the Government responded. ECF No. 94.

## II. LEGAL STANDARD

"It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014), *as amended* (Oct. 21, 2014) (citation omitted). The defendant bears both "the burden of production and persuasion." *Id.* (citation omitted).

## III. DISCUSSION

Allison argues that the April 15, 2021 interrogation and the seizure of the cell phone were unlawful and that evidence obtained as a result of these unlawful actions should be suppressed. ECF No. 69, PageID.282.

19

Specifically, Allison argues that: (1) Allison was in custody during the interview but was not provided with *Miranda* warnings; (2) Allison was not competent to consent to the interrogation and the search of the cell phone; (3) the warrantless seizure of the phone was unlawful. *Id.* at PageID.266–281. Each contention will be discussed in turn.

### A.   Whether Allison Was in Custody

Allison argues that he was in custody during the April 15, 2021 interview and that accordingly, *Miranda* warnings were required. ECF No. 69, PageID.266.

The Fifth Amendment dictates that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To the ends of protecting that right, *Miranda* requires law-enforcement officers to give warnings, including the right to remain silent, before interrogating individuals whom the officers have placed 'in custody.'" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citation omitted).

> In drawing the line between a non-custodial encounter between a citizen and the police (where *Miranda* does not apply) and a custodial encounter (where it does), courts consider "all of the circumstances" surrounding the encounter, with "the ultimate inquiry" turning on whether "a formal arrest" occurred or whether there was a "restraint on freedom of movement of the degree associated with a formal arrest."

*Id.* (citation omitted). "To answer this question, courts focus on the objective circumstances of the interrogation to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* (cleaned up). This inquiry is guided by "four, non-exhaustive factors: '(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions.'" *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017). Considering the totality of the circumstances surrounding the conduct of the interview, the Court determines that Allison was not in custody.

First, the interview took place at a Michigan State Police post, in an interview room. ECF No. 75-2, PageID.621. While this fact weighs in favor of a finding that Allison was in custody, it is not dispositive. *See Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) (finding that the fact that the interview occurred in the police station "point[s] in the … direction" of the interview being custodial but not finding this fact dispositive). Though he was in a police station, Allison had been told previously that he was not required to accompany Trooper Davis to the MSP post and was repeatedly advised that he was not being arrested, and that he was free to leave. A reasonable person would not have considered himself to be restrained under such circumstances.

21

Second, as to the length of the interview, it lasted about fifty minutes, from 5:28 p.m. to 6:20 p.m. Video, dated April 15, 2021 (on file with the Court). This relatively short period of time weighs against a finding that Allison was in custody. *See Luck*, 852 F.3d at 621 (finding that an interview of "roughly an hour" is "not lengthy by our standards"); *Panak*, 552 F.3d at 467 (finding that an interview lasting between 45 minutes and an hour "compares favorably with other encounters we have deemed non-custodial"); *United States v. Mahan*, 190 F.3d 416, 421–22 (6th Cir. 1999) (finding that an interview "last[ing] only an hour and a half" was not custodial).

Third, the manner of the interview shows there was no overt restraint on Allison's freedom of movement. Allison was transported to the police station in the front passenger seat. ECF No. 75-2, PageID.621. He was not handcuffed or otherwise physically restrained. Video, dated April 15, 2021 (on file with the Court). The interview occurred in an unlocked room. *Id.* While Davis sits near the door of the interview room, Davis does not block the door. *Id.*

Additionally, Davis reminded Allison multiple times that he was not under any restraint: At the Cummings Road residence, Davis informed Allison that it was "voluntary" to come to the station. ECF No. 88, PageID.783. In the patrol car prior to the interview, Davis advised Allison that "he was not being detained and was free to not answer my questions and I would take him home at once." ECF No. 75-2,

PageID.621. At the outset of the interview Davis reminded Allison that if he wanted, he was "free to get up" and that Davis would "take [him] back home." ECF No. 77, PageID.639. Later, Davis told Allison, "You're not being kept here. You're not detained. Nothing like that." *Id.* At the end of the interview, when Allison told David that he does not want to go to jail, Davis reminded him that "I'm not taking you to jail right now." *Id.* at PageID.690. After the interview, Davis drove Allison back to the Cummings Road residence. ECF No. 75-2, PageID.624.

Fourth, Allison was told multiple times that he was under no obligation to answer any questions. In the patrol car, Davis advised Allison that he "was free to not answer my questions and [Davis] would take him home at once." ECF No. 75-2, PageID.621. At the beginning of the interview, Davis told Allison, "So, before I start talking about the stuff, I am going to tell you again, you don't have to answer my questions." ECF No. 77, PageID.639. Davis reiterated that Allison was "free to get up" and tell Davis, "I don't want to talk to you," and Allison would be taken back home. *Id.* Later, before Allison began writing his statement, Davis said to Allison, "if you want to—if you don't want to, it's no big deal—if you would write a statement on here." *Id.* at PageID.653.

Finally, review of the video recording of the interview discloses that Davis's general demeanor was not coercive, demanding, or threatening. He spoke to Allison "in a calm, conversational manner, never becoming aggressive or brandishing … weapons." *Luck*, 852 F.3d at 621.

23

Under the totality of these circumstances, Allison was not "restrained to a degree associated with formal arrest." *Luck*, 852 F.3d at 621. Accordingly, the Court finds that he was not in custody.

Allison's arguments to the contrary are unavailing. Allison argues that the fact that "[t]he detective did not question Mr. Allison at the home," but instead took him "to a Michigan State Police post, ten miles from the house, without transportation of his own, miles from where he knew anyone," is evidence of a custodial interrogation. ECF No. 69, PageID.266. While such facts are more suggestive of a custodial setting, considering the totality of the circumstances, they are not sufficient to show that Allison was in custody. These facts must be weighed against the fact that Davis reminded Allison multiple times that he was free to leave, that he did not need to answer any questions, and that Davis would drive him back if Allison wanted. Under these circumstances, the Court concludes that a reasonable person in the position of Allison would not consider his freedom of movement restrained to a degree associated with a formal arrest. Indeed, a reasonable person would conclude that he was free to leave and was not under arrest. Accordingly, the Court concludes that Allison was not in custody.

This conclusion is in line with prevailing case law. Thus, while it is true that when an individual voluntarily goes "to the station in the company of the police, … a finding of custody is much more likely," 2 Wayne R. LaFave et al., Crim. Proc. § 6.6(d) (4th ed. 2024), in analogous

circumstances (or in circumstances *more* suggestive of a custodial setting), courts have come to the same conclusion as this Court and concluded that the interview was non-custodial.

For instance, in *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), the Sixth Circuit concluded that an interviewee was not in custody even where the circumstances were *more* suggestive of a custodial setting:

> (1) [the interviewee] was the sole suspect in the investigation; (2) he was transported by car to the police station for questioning, "precluding his ability to leave without the officers['] permission and willingness to drive him home"; (3) he was questioned at the police station and "interrogated for four hours (in an increasingly hostile setting)"; (4) he was "lied to by the officers regarding eyewitnesses['] placing Mason at the crime scene"; (5) he was "repeatedly told he was not under arrest even though his parole officer stood ready to immediately arrest him as soon as the interrogation ceased"; and (6) he was arrested for a parole violation after the … interrogation.

*Id.* at 632 (footnotes omitted).

Similarly, in *United States v. Muhlenbruch*, 634 F.3d 987 (8th Cir. 2011), the Eighth Circuit found that following circumstances indicated that the interviewee was not in custody:

> Here, [the interviewee] was confronted by police at his apartment and, without knowing the reason for their presence, he accompanied the officers to the police station for questioning. [The interviewee] was told that he was not under arrest and he was placed in the back seat of a patrol car for a short ride to the police station. At the station, [the interviewee] was not handcuffed and, at the beginning of the interview, [the interviewee] was informed that he was not

under arrest and that he was free to leave at any time. [The interviewee] was interviewed by two officers in a small room with the door closed for approximately twenty-two minutes and he confessed to downloading child pornography about seven-and-a-half minutes into the interview. The interviewing officers did not make threats or promises to [the interviewee] during the interview.

*Id.* at 996 (footnotes omitted). The Eighth Circuit placed "significant emphasis on the fact that the defendant was told before his interview that he was not under arrest and that he was free to leave at any time." *Id.* at 996–97.

Nor do Allison's other arguments compel a different outcome. Allison argues that "the traditional hallmark of police control is the removal of a person to a police facility," ECF No. 69, PageID.267, and that "a reasonable person in Mr. Allison's shoes 'could have seen the station house questioning as a new and distinct experience,' and '*Miranda* warnings could have made sense as presenting a genuine choice' whether to talk to the detective," *id.* at PageID.269 (citing *Coomer v. Yukins*, 533 F.3d 477, 491 (6th Cir. 2008)). However, the Sixth Circuit has held that the "fact that [the interviewee] was questioned in a 'coercive environment' such as a police station does not necessarily constitute custodial interrogation." *Mason*, 320 F.3d at 632. In fact, in circumstances which parallel the circumstances facing Allison, courts have found that the interview was non-custodial. *See*, *e.g.*, *id.*; *Muhlenbruch*, 634 F.3d at 996.

Allison also highlights that Davis warned that if he "start[ed] lying to me then, you know, I'm going to take that thing as far as I can take it because I have the authority and the power to." ECF No. 77, PageID.640. However, Davis's admonitions to Allison about the importance of truthfulness do not suggest that Allison was in custody. *See Mahan*, 190 F.3d at 422 (being told that "giving false information during the interview would be a serious matter" does not "even remotely constitute[] a restraint on the freedom of movement to the degree associated with formal arrest").

The Court concludes that the totality of the circumstances indicates that Allison was not in custody and was free to leave. Thus, *Miranda* warnings were not necessary. *See United States v. Elliott*, 876 F.3d 855, 866 (6th Cir. 2017) ("no *Miranda* warnings are necessary if a subject is not in custody and is free to leave"). Accordingly, the failure to provide the *Miranda* warnings does not support suppression of Allison's statements, and that aspect of his motion will be denied.

**B.    Whether Allison Was Competent to Give Consent**

Allison argues that he was not competent to "consent[] to the interrogation and voluntarily accompan[y] the detective to the state police station" and consent to the search of the cell phone. *See* ECF No. 69, PageID.269–79. We address these issues in turn.

27

### 1. Whether Allison's Inculpatory Statements Were Given Voluntarily

Allison points to his medical history to show that Allison "was suffering from a delusional disorder." *Id.* at PageID.274. For instance, Allison points to following snippets of his medical records:

On January 10, 2014, a Jackson County Probate Court found that as a result of Mr. Allison's mental illness, "[his] judgment is so impaired that the individual is unable to understand the need for treatment. Continued behavior as the result of this mental illness can be reasonably expected." ECF No. 69-8, PageID.318. On January 13, 2014, a copy of that order was sent to the Michigan State Police. ECF No. 69-9, PageID.322. Subsequently, on November 2 and November 25, 2020, Allison was hospitalized. ECF No. 69, PageID.275. The records of these hospitalizations reference delusions. *Id.*

"On January 4, 2021 Mr. Allison was again hospitalized." ECF No. 69, PageID.275. On January 7, 2021, the Jackson County Probate Court required hospital treatment. ECF No 69-12, PageID.398. On January 8, 2021, a copy of the January 7, 2021 order was sent to the Michigan State Police. ECF No. 69-4, PageID.312.

Reports by doctors during this hospital stint give, according to Allison "clear insight into Mr. Allison's incompetency." ECF No. 69, PageID.275. For instance, one doctor reported

Throughout our encounter the patient displays overt fixed paranoid delusions related to the government. He reports that

28

he believes that he is a part of the Department of Defense, and is waiting for them to give him his official assignment. He reports that he has been receiving information from the Department of Defense through "policy notices" on the various applications on his cell phone, reporting that he believes that he will be moving up in the department soon.

ECF No. 70-2, PageID.465. Allison was discharged on January 15, 2021. ECF No. 69, PageID.276. On March 25, 2021, Allison "was treated for his mental disorder." *Id.* at PageID.277.

Pointing to this medical history and his behavior during the interview, Allison appears to argue that his inculpatory statements and his decision to accompany Davis to the police station were involuntary because Allison was not competent. *Id.* at PageID.269. However, in his briefs, Allison does not point to case law that directly addresses the relevant question: the effect of Allison's purported mental incompetence on the voluntariness of his inculpatory statements. Instead, Allison cites to case law which addresses the concept of competence in the context of a defendant waiving his *Miranda* rights, *see id.* at PageID.272 (citing *Garner v. Mitchell*, 502 F.3d 394 (6th Cir. 2007)), and in the context of a defendant seeking to plead guilty or waive counsel, *see* ECF No. 69, PageID.273 (citing *Godinez v. Moran*, 509 U.S. 389 (1993)). However, "the question of whether a *Miranda* waiver was knowing and intelligent is a separate question" from the question of whether "a confession was involuntary." *Smith v. Mitchell*, 567 F.3d 246, 257 (6th Cir. 2009) (citing *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005)); *cf. Edwards v.*

*Arizona*, 451 U.S. 477, 484 (1981) ("the voluntariness of a consent or an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries" (citations omitted)). Specifically, whereas a waiver of *Miranda* must be knowing, intelligent, and voluntary, a confession arising in a non-custodial setting *must only be voluntary*. *Smith*, 567 F.3d at 257. Thus, contrary to Allison's argument, *see*, *e.g.*, ECF No. 92, PageID.918, not every "waiver" of a constitutional right must be knowingly and intelligently made. For instance, the Supreme Court has explained that

> Our cases do not reflect an uncritical demand for a knowing and intelligent waiver in every situation where a person has failed to invoke a constitutional protection. … With respect to procedural due process, for example, the Court has acknowledged that waiver is possible, while explicitly leaving open the question whether a knowing and intelligent waiver need be shown.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973).

Accordingly, case law exploring the effect of an individual's purported incompetence on whether a *Miranda* waiver is knowing, voluntary, and intelligent do not govern the issue at hand: whether Allison's inculpatory statements were made voluntarily. *Smith*, 567 F.3d at 257. Here, the Court has already found that the interview was non-custodial, and there was no requirement to administer the *Miranda* warnings. Consequently, the issue of whether the defendant could

knowingly and intelligently waive his *Miranda* rights is not the relevant question.

Instead, the key question, for Fifth Amendment purposes, is whether the government engaged in any conduct that could be said to "compel" a person in a criminal case "to be a witness against himself." U.S. Const. amend. V. And, contrary to Allison's argument, the fact that a person suffers from a cognitive condition or deficiency is not enough to establish that the government compelled that person's testimony. "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989); *see Colorado v. Connelly*, 479 U.S. 157, 164 (1986) ("a defendant's mental condition, by itself and apart from its relation to official coercion, should [not] dispose of the inquiry into constitutional 'voluntariness'"); *accord Hill v. Shoop*, 11 F.4th 373, 426 (6th Cir. 2021).

Thus, when a defendant contends that his inculpatory statements were involuntary as a result of "a condition or deficiency that impaired his cognitive or volitional capacity," he must first establish that there was an element of police coercion. *Newman*, 889 F.2d at 94–95; *accord United States v. Prigmore*, 15 F.4th 768, 779 (6th Cir. 2021) ("Even if defendant's cognitive or volitional capacity was impaired, that is never, by itself,

sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." (cleaned up)).

Here, nothing in the record suggests that there was any coercive police activity: Davis reminded Allison multiple times that he was free to leave, that he did not need to answer any questions or provide a statement, and that Davis would drive him back if Allison wanted; Davis spoke in a calm, conversational manner; and Davis never made any promises or threats. In other words, the Court concludes that "the totality of the circumstances surrounding" Allison's "interview fall far short of the police coercion required to render a defendant's statement involuntary." *Mahan*, 190 F.3d at 423. Thus, Allison's "'mental condition, by itself and apart from its relation to official coercion,' cannot render his statement involuntary in the constitutional sense." *Prigmore*, 15 F.4th at 779 (citation omitted). Accordingly, the Court need not address whether Allison's "cognitive or volitional capacity was impaired." *Id.*

Allison contends that some coercion took place. For example, Allison argues that:

> the detective … made it clear that there was a cost if Mr. Allison failed to cooperate/consent. The detective misrepresented the nature of the conversation, and said they were just going to talk "man to man." He challenged Mr. Allison's manhood and said he hoped that Mr. Allison was "man enough to tell me the truth." He told Mr. Allison "if you tell me the truth we can work with things," "If you start lying to me I'm going to take this thing as far as I can take it."

ECF No. 69, PageID.270 (citations omitted). As to the Trooper's statements that he wanted to talk "man to man" and that he hoped Allison was "man enough to tell" the truth, such appeals to notions of "manhood," whether alluding to honor, maturity, or fidelity, and whether persuasive or not, cannot be said to be coercive or overbearing of one's will. Moreover, courts have held that admonitions to tell the truth do not constitute coercion. *See Mahan*, 190 F.3d at 422 ("Mahan alleges that Agent Walsh coerced him into admitting his role in the crime by telling him that he could get into serious trouble for providing false information and that his story was unbelievable. We disagree."); *United States v. Brinson*, 787 F.2d 593 (6th Cir. 1986) ("Encouraging her to tell the truth is no more than affording her the chance to make an informed decision with respect to her cooperation with the government." (cleaned up)).

Allison next argues that Davis "promised a reward for cooperation and threatened a penalty for silence" by telling Allison that "he had the 'authority and power' to control what happened in the investigation" and "If he is going to make me run around, we're going to push this thing." ECF No. 69, PageID.271. In context, however, these statements were simply further admonitions to tell the truth by Davis to Allison:

> You tell me the truth, and then we can work with things. …
> You start lying to me then, you know, I'm going to take that
> thing as far as I can take it because I have the authority and
> the power to … let's, let's—you know, let's work with stuff.
> He's being honest. He's manning up. He's being a man to me.

> Or if he's going to make me run in circles and go the long route
> … then we're going to push this thing, okay?

*See* ECF No. 77, PageID.640. Considered in the context in which they were made, these statements also do not constitute coercion.

Continuing in this vein, Allison argues that "the encounter was the result of a perceived taunt by Mr. Allison and the detective's desire respond to the taunt." ECF No. 69, PageID.271. Allison does not point to any case law, and the Court is not aware of any, considering the subjective motivations of the interviewing officer in determining whether there was coercion. The Court sees no reason why the officer's subjective motivations in pursuing an investigation of Mr. Allison pertain to the question of coercion. In fact, in other contexts, the Supreme Court has cautioned against considering an officer's subjective motivations. *See Whren v. United States*, 517 U.S. 806, 812 (1996) (holding that "an officer's motive [does not] invalidate[] objectively justifiable behavior under the Fourth Amendment").

Allison finally argues that the fact that Davis returned to the Cummings Road residence "meant to convey to Mr. Allison that the officer was not going away." ECF No. 69, PageID.271. Allison highlights that "Mr. Allison had already exercised his right not to speak to the detective by not responding to the visit on April 14, 2021. The detective returned on April 15, not because he was invited back, but because he was determined to get a statement." *Id.* However, nothing in the record

suggests that Allison had been present—let alone that he exercised his right not to speak—at the Cummings Road residence when the Trooper visited for the first time on April 14, 2021. In any case, the fact that Davis returned to the Cummings Road residence does not indicate that the interview was tainted by coercion.

Viewing the totality of this encounter, the Court concludes that the interview did not include any element of police coercion and there is no evidence showing that Allison's inculpatory statements were in any way involuntary. Accordingly, the Allison's argument that his mental condition rendered his statements coerced and subject to suppression is also rejected, and the motion to suppress evidence based on this contention will be denied.

### 2. Whether Allison Consented to the Search of His Phone Voluntarily

Allison also argues, albeit in passing, that he "was not competent to consent to the search of the cell phone." ECF No. 69, PageID.259.[2]

---

[2] Contrary to Allison's argument, case law which addresses the concept of competence in the context of a defendant waiving his *Miranda* rights are inapplicable to the question of "under what conditions an individual could be found to have consented to a search and thereby waived his Fourth Amendment rights." *Edwards*, 451 U.S. at 483; *Bustamonte*, 412 U.S. at 246 ("The considerations that informed the Court's holding in *Miranda* are simply inapplicable in the present case."). Specifically, in *Schneckloth*, the Supreme Court declined to impose the "intentional relinquishment or abandonment of a known right or privilege" standard to the analysis of under what conditions an individual

A person "is not precluded from consenting to a warrantless search simply because he or she suffers from a mental disease." *United States v. Richards*, 741 F.3d 843, 849 (7th Cir. 2014); *see Bustamonte*, 412 U.S. at 225; Wayne R. LaFave et al., Search and Seizure § 8.2(e) (6th ed. 2024) ("[i]t should not be assumed … that anyone suffering from some type of mental disease or defect is inevitably incapable of giving a voluntary consent to a search" (collecting cases)). Instead, a court must "assess[] the totality of all the surrounding circumstances" to determine the voluntariness of an individual's consent to a warrantless search. *Bustamonte*, 412 U.S. at 226. As the First Circuit has explained,

> The validity of a defendant's consent must be gauged under the totality of the circumstances. When evaluating the totality of the circumstances, an inquiring court must look for evidence of coercion, duress, confusion, and the like. A consenting party's mental frailties may have a bearing upon this analysis. But such frailties are entitled to little weight in the abstract.

*United States v. Coombs*, 857 F.3d 439, 449 (1st Cir. 2017) (citations omitted).

---

could be found to have consented to a search and thereby waived his Fourth Amendment rights. *Bustamonte*, 412 U.S. at 246. Instead, the Supreme Court required only that the consent be voluntary under the totality of the circumstances. *Id.* at 241; *accord Edwards*, 451 U.S. at 483. In other words, the special protection of the knowing and intelligent waiver standard that applies in the *Miranda* context does not apply to the inquiry on the voluntariness of a consent to a search or an admission. *Bustamonte*, 412 U.S. at 246; *Edwards*, 451 U.S. at 483.

The "voluntariness inquiry" is a "fact specific" analysis. *United States v. Tellez*, 86 F.4th 1148, 1151 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 1083 (2024). Courts consider "factors such as the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *Id.* (cleaned up). Additionally, because a court's "review is aimed at 'regulating police conduct,' … to achieve that objective," it is appropriate for courts to only consider "what objective facts were known to the inquiring officer at the time consent was given." *United States v. Richards*, 741 F.3d 843, 849 (7th Cir. 2014); *see Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (voluntariness is a question of "[r]easonableness" which "is measured in objective terms"); *cf. United States v. Penney*, 576 F.3d 297, 309 (6th Cir. 2009) ("reasonableness of police officers' beliefs is evaluated in light of all particular facts known to the officers").

The Court finds that, assessing the totality of the circumstances, Allison's consent to a search of the phone was voluntary.

First, Davis clearly and plainly explains to Allison what consent would entail. Thus, Davis tells Allison, "by you signing this saying that you're giving me consent to open this phone up, give me the passcodes and look in this phone." ECF No. 77, PageID.665.

Second, in asking for consent, Davis underscores multiple times that it is Allison's choice whether to allow him to search the phone. Davis asks Allison whether he would "be willing to show me the passcode and just show me it—where that stuff is at?" ECF No. 77, PageID.652. Later, Davis clarifies that Allison should only sign the consent form "if you're willing to do so" and that Allison doesn't "have to if you don't want." *Id.* at PageID.652–53; *see also id.* at PageID.665 ("If you're okay to sign that, if you could sign that right there.").

Third, Allison's consent is unequivocal. Indeed, Allison is cooperative throughout the interview. When Davis asks for his consent to search the phone, Allison responds, "I could sign into it right now." *Id.* at PageID.652. At another point, Allison asks Davis, unprompted, "Can I get into that phone for you? … Because I have child porn on it, if you use my password." *Id.* at PageID.660. Later, when Davis asks for "the passcode of this phone," Allison volunteers, "Here, can I just put my finger. It would be easier." *Id.* at PageID.666.

Fourth, as explained above, the interview was non-custodial and the record does not reflect any element of police coercion.

Fifth, while there were some gaps and inconsistencies in Allison's explanation, Allison appears lucid, responsive, and intelligible throughout the interview. Allison also clearly understood the gravity of the situation—recognizing that he would eventually go to jail, ECF No. 77, PageID.690, and recognizing that "what [he] was doing … was gross

now," *id.* at PageID.656—and chose to cooperate with Davis. In such circumstances, "post hoc claims of incompetency inspire suspicion." *Coombs*, 857 F.3d at 449 ("When the evidence shows that the consenting party was responsive, lucid, and cooperative with the police officers, post hoc claims of incompetency inspire suspicion." (cleaned up)).

Sixth, Allison appears to understand his relevant constitutional rights: at one point, Allison asks Davis whether he "[c]an … see the warrant … first." ECF No. 77, PageID.653. At another point, when Davis tells him that he doesn't have to sign the consent form if he doesn't "want to," Allison says "Okay." *Id.*

Accordingly, having considered the totality of all the circumstances, the Court finds that Allison's consent to the search of the cell phone was voluntary.

Allison's arguments to the contrary fail to persuade the Court.

First, Allison highlights that "medical and court records" show that his "thought processes were consistently anything but reasoned." ECF No. 69, PageID.274. Thus, Allison argues, he "did not have the capacity to reasonably or rationally understand the impact of his alleged consent to [the search of his cell phone]." *Id.*[3]

---

[3] Allison actually argues that "Mr. Allison did not have the capacity to reasonably or rationally understand the impact of his alleged *consent to the interrogation or waive his constitutional rights against selfincrimination and assistance of counsel*." *Id.* (emphasis added). Thus,

However, Allison does not show how his purported "ongoing mental state," *id.*, adversely affected his decision to consent, rendering it involuntary. In other words, nothing in the record suggests that Allison's medically documented mental impairment played any role in determining his decision to consent. In the absence of such a connection, it cannot be said that Allison's mental state affected the voluntariness of his consent. *See Coombs*, 857 F.3d at 449 ("there must be evidence of some nexus between, say, the individual's mental condition and the giving of consent"); *United States v. Reynolds*, 646 F.3d 63, 74 (1st Cir. 2011) (requiring a connection between the purported impairment and the consenting).

Furthermore, Allison does not show that Davis was aware of Allison's medically documented mental impairment. In fact, during the November 17, 2025 hearing, Davis testified that he did not see anything in LEIN regarding Allison's mental health prior to the interview. ECF No. 88, PageID.811. Davis also testified that, at the time of the interview, he did not know that Allison "had any mental health history." *Id.*[4] It

---

Allison does not relate this argument to whether he was competent to consent to the search of the cell phone. However, Allison mentions his consent to the search of the cell phone in the title of the section.

[4] Allison argues that the "Court should impute knowledge of the mental health order to Trooper Davis, or if not impute knowledge, find the failure to know was misconduct. ECF No. 92, PageID.920. Courts impute collective knowledge among multiple law enforcement officials or

therefore cannot be said that it was unreasonable for Davis to rely on Allison's consent. *Richards*, 741 F.3d at 849 ("Our review is aimed at 'regulating police conduct,' and to achieve that objective, the appropriate standard is what objective facts were known to the inquiring officer at the time consent was given." (citation omitted)).

Second, Allison argues that his "behavior and statements during the interrogation mirror some of his statements to his clinicians and independently demonstrate the inherent unreliability of this interrogation." ECF No. 69, PageID.277–78. In support, Allison appears to contend that his explanation during the interview—that he was hacked and wanted to report the child pornography on his cell phone— was the result of "paranoid delusion" and "rambling." *Id.* at PageID.278– 79.

---

agencies in the context of allowing officers to "conduct a stop based on information obtained by fellow officers." *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012). Allison provides no case law applying this practice to this context. Instead, Allison argues that the practice "ought to apply when the government claims the officer did not have knowledge of a fact." ECF No. 92, PageID.920. Given that the rule reflects the practical reality that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another," *Lyons*, 687 F.3d at 766, the Court declines to extend the collective knowledge rule to a context lacking those considerations. Additionally, the Court declines to find that the failure of Davis to know of Allison's mental health history constitutes misconduct—a contention Allison completely fails to develop.

The Court disagrees. While Allison's explanation of how the materials came to be on the phone may fail to persuade a fact finder or may include gaps and inconsistencies, Allison's behavior during the interview does not evince a mental impairment so as to render his consent involuntary. In fact, throughout the interview, Allison appears to adapt his explanation to fit new information Davis presented to him, *see* ECF No. 77, PageID.642 (Allison tells Davis that he was hacked in 2020 or 2021, but Davis explains that the incidents at issue happened "in the December of 2019"); *id.* at PageID.686 (Allison then explains that he was in fact hacked "2019 in December"), indicating substantial mental acuity.

> Third, Allison argues that
>
> The detective lied about the existence of a search warrant for the phone. When he was asked to sign the consent to search, Mr. Allison asked to see the search warrant. Instead of admitting there was no search warrant, the officer misrepresented the circumstances, replied that the search warrant was given to the cell provider then muttered something else about a warrant, and then changed subjects, saying he would help Mr. Allison find the (nonexistent) website, leaving in place the suggestion there was a warrant for the cell phone.

ECF No. 69, PageID.280.

The Court does not agree with Allison's portrayal of the facts as disclosed by the video recording of the interview.

The following recounts the context of Allison's inquiry into whether there is a warrant. Davis asks for Allison's consent to search to phone, emphasizing that it is Allison's decision whether to consent to the search, *see* ECF No. 77, PageID.652–53 ("and I want you to sign that, if you're willing to do so, telling me the passcode and opening the phone to show me, okay. But if you don't mind—you don't have to if you don't want to … "), Allison interrupts Davis and asks, "Can I see the warrant, though, first?" *id.* at PageID.653. Davis begins responding, "Well, it's—there was the search warrant that went to the Snap account. I've actually served …," before Allison interrupts again, "The Snap account now, I don't have it." *Id.* After Allison finishes his explanation of what happened to his Snapchat account, Davis again emphasizes, "if you don't mind, if you want to—if you don't want to, it's no big deal—if you would write a statement on here." *Id.* Allison agrees to do so. *Id.* After this exchange, Allison remains proactively cooperative throughout the remainder of the interview. *See*, *e.g.*, *Id.* at PageID.660 (Allison offering, unprompted, "Can I get into that phone for you? … Because I have child porn on it, if you use my password.").

A review of the interview shows that although Davis could have been clearer that there was *no* warrant for the cell phone itself, in light of Allison's interruption Davis cannot be faulted for the ambiguity of his disrupted response. Additionally, Davis clarifies, before and after Allison's question, that Allison could choose whether to consent or not—

43

dispelling any potential ambiguity that might have arisen from Davis's response to Allison's inquiry into the warrant. Of course, Davis would not have needed to ask for Allison's consent to search the phone if he had a warrant. Furthermore, Allison affirmatively cooperates throughout the remainder of this interview—belying Allison's claim that he merely "acquiesced," ECF No. 69, PageID.280, to Davis's authority. In any case, Allison asked to see the warrant *after* he had already verbally consented to the search. *See* ECF No. 77, PageID.652. Thus, any potential ambiguity of Davis's response cannot be said to have caused Allison's consent.

Thus, the Court concludes that, considering the totality of the circumstances, Allison's consent to the search of his phone was voluntary. Accordingly, the Court will deny Allison's motion to suppress evidence based on the lack of consent to search the phone.

### C.  Temporary Warrantless Seizure of Cell Phone

With regard to the initial encounter with Trooper Davis, Allison also argues that the warrantless seizure of the cell phone at the Cummings Road residence "was unlawful." ECF No. 69, PageID.279. Specifically, Allison argues that "The phone was not seized pursuant to a warrant. The detective did not seek Mr. Allison's consent before he seized the phone. The detective admitted he 'grabbed' the phones merely because they were identified as belonging to Mr. Allison." *Id.* at PageID.280.

44

In response, the Government argues that "the brief, warrantless seizure of Allison's cellphone was permissible." ECF No. 75, PageID.615. The Government supports its position by citing case law on the "exigent circumstance" exception. ECF No. 75, PageID.614 (citing *United States v. Dickson*, No. 21-6176, 2022 WL 2348902 (6th Cir. June 29, 2022) and *United States v. Williams*, 998 F.3d 716 (6th Cir. 2021)). Specifically, the Government argues that

> Like the law enforcement agents in *Dickson*, Trooper Davis here was investigating Allison for multiple child pornography offenses—crimes frequently committed using cellphones like the one Allison had on April 15, 2021. Given the great interest in preventing the spread of CSAM, Trooper Davis was justified in briefly seizing Allison's phone as Allison agreed to accompany Trooper Davis to the station for an interview.

*Id.* at PageID.614.

> In response, Allison argues that

> The seizure here was clearly was not an emergency [sic]. There was nothing about this encounter that prevented Trooper Davis from obtaining a warrant before he seized the phone. Mr. Allison made no effort to interfere with any action taken by Trooper Davis. Neither Mr. Allison nor any other person made an effort to conceal the phone from the trooper or destroy it or its contents. It is undisputed that the phone was not in Mr. Allison's possession at the time it was seized. The government's own exhibit confirms that the phone was not in Mr. Allison's possession when it was seized. Nothing prevented Trooper Davis could not have called for another trooper to stand by the premises and make sure the phone was not moved while he obtained a warrant.

ECF No. 82, PageID.734.

45

Having considered the governing case law and the facts, the Court concludes that the temporary warrantless seizure of the cell phone was not unreasonable.

The Fourth Amendment dictates that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The amendment's "'central requirement' is one of reasonableness." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001); *accord Barnes v. Felix*, 605 U.S. 73, 79 (2025) ("The touchstone of the Fourth Amendment is reasonableness, as measured in objective terms." (cleaned up)).

> In order to enforce that requirement, th[e Supreme Court] has interpreted the Amendment as establishing rules and presumptions designed to control conduct of law enforcement officers that may significantly intrude upon privacy interests. Sometimes those rules require warrants. We have said, for example, that in the ordinary case, seizures of personal property are unreasonable within the meaning of the Fourth Amendment, without more, unless accomplished pursuant to a judicial warrant, issued by a neutral magistrate after finding probable cause.

*McArthur*, 531 U.S at 330 (cleaned up).

Nonetheless, there are "exceptions to the warrant requirement." *Id.* For instance, "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions … certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *Id.* Thus, the Supreme Court has sanctioned "a

temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time." *Id.* at 951–52. When assessing the reasonableness of an officer's action without a warrant, courts look "to the totality of circumstances." *Missouri v. McNeely*, 569 U.S. 141, 149 (2013).

In *United States v. Mason*, No. 21-5384, 2021 WL 5647774 (6th Cir. Dec. 1, 2021), the Sixth Circuit applied these principles to evaluate two actions taken by officers: (1) the initial warrantless seizure of a cell phone by officers while they interviewed the owner of the phone, followed by (2) the officers leaving the scene of the interview with the phone. Specifically, law enforcement, while conducting a knock-and-talk encounter, were given permission to enter an apartment at which an individual, suspected of having child pornography on his phone, was temporarily residing. *Id.* at *1. The officer, Officer Miller, asked the suspect, Johnathan Mason, to accompany him outside and Mason complied. *Id.*

> Once outside the apartment, Officer Miller asked Mason about the location of his shoes and phone. Mason said they were in the apartment. The male occupant overheard the conversation and invited Officer Miller back inside. Mason did not object to Officer Miller reentering the apartment. The male occupant pointed out Mason's phone. Officer Miller retrieved the phone and shoes and exited the apartment.

47

*Id.* at *2. The Sixth Circuit found this initial seizure to be justified. *Id.* at
*3. Specifically, the Sixth Circuit considered following circumstances:

> Officer Miller's investigation indicated that Mason accessed
> social media accounts using a cell phone to traffic in child
> pornography over the preceding two months, Mason's ex-
> girlfriend said she would not be surprised if Mason operated
> the accounts, and she recently found Mason transferring data
> from her computer to his phone, which he then refused to
> show her.

*Id.* The Sixth Circuit found that on this record, the officer's decision to
"grab Mason's cell phone" was permissible. *Id.* ("Officer Miller
permissibly seized the cell phone for temporary investigation"). The Sixth
Circuit explained that "Officers may temporarily seize personal property
for investigation without a warrant when they have reasonable suspicion
that the property contains evidence of a crime." *Id.*

Subsequently, the officers took the suspect's phone with them when
they left the scene. *Id.* The Sixth Circuit found this action to be
permissible considering the following circumstances: during the
interview of the defendant, "Mason exhibited an 'emotional response' to
the officer's allegations, expressed that he just wanted 'this to go away,'
and asked if he could wipe the phone's contents." *Id.* On this record, the
court concluded that the officer "justifiably seized the cell phone because
Mason's actions created the imperative of preventing the destruction of
evidence and of retaining custody of the phone until a magistrate issued
a warrant to search it." *Id.* The Sixth Circuit reasoned that "[i]f officers

48

develop probable cause to believe that property contains evidence of a crime, they may seize the property pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it." *Id.*

The circumstances considered by the Sixth Circuit in *Mason* are analogous to this case: Davis temporarily seized the phone for the duration of the interview and kept the phone after the interview. The initial temporary seizure was justified by "reasonable suspicion"—in fact, probable cause—"that the property contains evidence of a crime." *Id.* The subsequent seizure of the phone following the interview was justified by probable cause to believe that the cell phone contained evidence of a crime and an "imperative of preventing the destruction of evidence and of retaining custody of the phone until a magistrate issued a warrant to search it." *Id.*[5] The specific circumstances which compel such a conclusion are discussed below.

First, at the time of the initial seizure, Davis had probable cause to suspect that the cell phone that had been in Allison's pocket contained evidence of a crime:

---

[5] Of course, the Court does not read *Mason* as suggesting that officers may permanently seize phones without a warrant as long as they have a reasonable suspicion that a phone contains contraband. Instead, *Mason* suggests that the *temporary* seizure of a phone *may* be reasonable in light of the totality of the circumstances, which include exigencies such as an articulable concern that evidence may be altered or destroyed.

- On November 28, 2019, Davis had spoken to a minor individual who had been asked on Snapchat by user "jtickle12" to send naked pictures of her. ECF No. 69-29, PageID.449.
- "jtickle12" had also sent that minor individual "images of him masturbating and CSAM images and videos." *Id.*
- "jtickle12" had acknowledged to the minor individual that the CSAM images were of children under ten years of age. *Id.*
- In response to a subsequent search warrant, Snapchat provided information to Davis, allowing him to determine that the "account holder of 'jtickle12' is Brandon Tyler Allison." *Id.*
- On Snapchat, "jtickle12" stated "he lives in the City of Jackson, Michigan and then stated his name is Brandon Allison." *Id.*
- Using LEIN/SOS, Davis determined that a Brandon Tyler Allison lived "at 5175 Cummings Road, Jackson Michigan." *Id.*
- Comparing a Brandon Tyler Allison's license photo to pictures from "jtickle12"'s Snapchat account, Davis confirmed that the two were the same person. *Id.*
- Davis determined that "jtickle12" "sent a total of 19 CSAM images and videos to teenage girls." *Id.*

In view of how Snapchat is commonly used as a social media application for sharing images and messages over a cell phone, common sense suggests that if a Snapchat account is used to send and solicit CSAM images, it is likely that CSAM images will be present on the cell phone of that Snapchat account holder. *Cf. United States v. Terry*, 522 F.3d 645, 648 (6th Cir. 2008) ("the district court did not err in concluding that 'as a matter of plain common sense, if ... a pornographic image has originated or emanated from a particular individual's email account, it logically

50

follows that the image is likely to be found on that individual's computer or on storage media associated with the computer'" (ellipses in original)).

Second, as the Government argues, at the time of the initial seizure, some exigent circumstances justified a temporary seizure. Namely, Davis had been trying to locate Allison, who had been using public internet access, ECF No. 88, PageID.783, for a while, ECF No. 77, PageID.634. Additionally, as the Government highlights, immediately prior to the initial seizure, Allison had removed the phone from his pocket and placed it on the residence's table, possibly in an attempt by Allison "to distance himself from his phone." ECF No. 94, PageID.966. In light of such behavior, and given that Allison did not have a permanent residence and had been difficult to locate, Davis reasonably operated under the belief of some exigency—if he did not temporarily secure the phone, Allison would be in a position to delete or alter its contents, or even to try to destroy the phone when he had a motive to do so.

Third, during the interview, which was conducted shortly after the initial seizure, Allison acknowledged that he had "deleted" pictures of underage girls, ECF No. 77, PageID.676, and that he had "been trying to delete everything that I had because I was trying to change my ways." *Id.* at PageID.677. Allison also made numerous contradictory remarks and, at times, acted defensively. By the end of the interview, therefore, Allison's remarks had "created the imperative of preventing the destruction of evidence and of retaining custody of the phone until a

magistrate issued a warrant to search it." *Mason,* 2021 WL 5647774, at *3.

Fourth, Davis obtained a warrant on April 29, 2021, fourteen days after the interview. ECF No. 69-29, PageID.450. In similar circumstances, courts have found longer periods of time between a warrantless seizure and the submission of a warrant application reasonable. *United States v. Laist*, 702 F.3d 608, 616 (11th Cir. 2012) (finding 25-day delay reasonable).

Fifth, Allison's taking his phone out of his pocket in the presence of the officer and placing it on a table next to another individual's phone in a residence in which he was residing only temporarily, together with his apparent acquiescence when Davis picked up the phones, created some ambiguity as to the strength of his possessory interest in the phone. ECF No. 88, PageID.801–02. While these facts do not indicate that Allison abandoned his phone, Allison's actions during the initial seizure of his phone could be said to suggest that Allison had a relatively "lower expectation of privacy," *United States v. Oswald*, 783 F.2d 663, 667 (6th Cir. 1986), in the phone compared to situations where a phone is on one's person or in one's own house.

Lastly, and most significantly, Allison consented to the search of the cell phone during the interview—which was within an hour or so of the initial seizure—and did not later withdraw his consent. Thus, the warrantless seizure of Allison's phone was only non-consensual for a

short period of time—the time it took to drive from the Cummings Road residence to the station and a portion of the interview—which was well under an hour.

In light of all of these circumstances—probable cause at the time of the initial seizure that Allison's phone contained evidence of a crime, Allison's actions at the time of the initial seizure, an imperative to prevent the destruction of evidence created by Allison's comments during the subsequent interview, the subsequent issuance of a warrant, and the brief nature of the period during which the warrantless seizure was not consented to—the Court concludes that Davis's temporary warrantless seizure of Allison's phone was reasonable.

The Court therefore concludes that, considering the totality of the circumstances, the temporary warrantless seizure of the cell phone was reasonable under the Fourth Amendment. Consequently, Allison's motion to suppress evidence challenging the lawfulness of the initial seizure must be denied.

But even if the Court held the initial seizure of the phone to be unlawful—which it does not—Allison's motion to suppress would *still be denied* given that evidence obtained from the search of the phone would be admissible in light of the subsequent search warrant obtained by Davis. *United States v. Bowden*, 240 F. App'x 56, 61 (6th Cir. 2007) ("where … a potentially illegal search was followed by a search conducted

in accordance with a valid search warrant premised on evidence of probable cause developed independently of the initial search").

Specifically, the affidavit accompanying the search warrant for a "black in color Coolpad brand smart cellular telephone device with a blue in color protective case, serial number CP35605A5 that is in possession of the Michigan State Police," obtained on April 29, 2021 includes sufficient facts allowing a finding of probable cause that evidence would be found on the phone, even when all facts occurring after the initial seizure are excised from the affidavit. ECF No. 69-29, PageID.449. The affidavit attests that a Snapchat account associated with Allison sent and solicited CSAM to minors and that when the affiant, Davis, made contact with Allison, "he had a smart phone on his person with a blue in color protective case." *Id.* at PageID.449–50. These facts are enough for a finding of probable cause that contraband would be found on the phone. *See, e.g.*, *United States v. Underwood*, 129 F.4th 912, 936 (6th Cir. 2025), *cert. denied*, No. 25-5329, 2025 WL 2824485 (U.S. Oct. 6, 2025).

Allison argues that "[b]ut for the unlawful seizure, the trooper would not have had or known the description of the phone to be searched" ECF No. 82, PageID.736. However, prior to his seizure of the phone, Davis observed that the cell phone was in Allison's pocket and later observed Allison place it on the table. Thus, the description of the phone—with the possible exception of the mention of the serial number and the maker of the phone—was not obtained as a result of Davis's

54

seizure of the phone. Such a description is sufficient to identify the item to be searched: The Sixth Circuit has upheld a warrant that only described a phone by the phone's physical features and by the fact that it was found on the suspect's person, *see Underwood*, 129 F.4th at 936 (given that an affidavit provided the "correct physical details of that phone" and "[g]iven that officers recovered only one phone from [the suspect], … there was no reasonable probability officers would search the wrong phone").

Allison also argues that "[b]ut for the unlawful seizure, the trooper would not have had … Mr. Allison's admission that [the phone] contained child pornography." ECF No. 82, PageID.736. However, as the Court explains above, averments that an individual used Snapchat to send CSAM establish probable cause that the individual's phone would contain evidence of such actions. *See Terry*, 522 F.3d at 648 ("the district court did not err in concluding that 'as a matter of plain common sense, if ... a pornographic image has originated or emanated from a particular individual's email account, it logically follows that the image is likely to be found on that individual's computer or on storage media associated with the computer'" (ellipses in original)).

The Court concludes that, considering the totality of the circumstances, Allison's motion to suppress evidence challenging the lawfulness of the initial seizure must be denied. However, even if the initial seizure were found to be unlawful and its fruits excluded from the

affidavit for the search warrant, the remaining facts set out sufficient probable cause and the warrant provided authority to search the phone. Allison's motion to suppress evidence would still be denied.

## IV.  CONCLUSION

For the reasons explained above, Defendant Allison's motion to suppress (ECF No. 69) is hereby **DENIED**.

**SO ORDERED.**

Dated: January 7, 2026<sub></sub>January 7, 2026

s/Terrence G. Berg
HON. TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE